# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF GEORGIA

# SAVANNAH DIVISION

JARNARD M. WILLIAMS,       )
                            )
      Petitioner,           )
                            )
v.                       )          CV415-292
                            )
STANLEY WILLIAMS,        )
                            )
      Respondent.       )

## <u>REPORT AND RECOMMENDATION</u>

Following affirmance of his conviction for, *inter alia*, felony murder, *Williams v. State*, 290 Ga. 533, 540 (2012), Jarnard M. Williams unsuccessfully sought state habeas relief, doc. 14-22,[1] *certificate of probable cause to appeal denied*, doc. 14-23, and now petitions this Court for federal habeas relief under 28 U.S.C. § 2254. Doc. 1. Sentenced to life plus twenty years, *Williams*, 290 Ga. at 540 n. 1, Williams' core claim

---

[1] For this and all other documents the Court is citing only to the page numbers imprinted on the top of each page by the Court's docketing software, and not the individual manuscript pagination. Incidentally, some of the State's documents, including trial and state habeas hearing transcripts, bear two sets of printed page numbers.

is that his prosecutor violated her *Brady/Giglio*[2] duty. After a thorough review of the record, the Court finds that the State court misapplied controlling Supreme Court precedent and unreasonably concluded that the state prosecutor had not made a side deal regarding the future prosecution of a key state witness when, in truth, not only had such a promise been made, but the prosecutor deliberately concealed that promise from the jury. Williams has shown, therefore, that he is entitled to federal habeas relief from his conviction.

---

[2] In *Brady v. Maryland*, 373 U.S. 83 (1963), "the Supreme Court held that due process requires a prosecutor to disclose material exculpatory evidence to the defendant before trial. *Brady*, 373 U.S. at 87, 83 S.Ct. at 1196-97." *In re Bolin*, 811 F.3d 403, 408 (11th Cir. 2016). *Giglio v. United States*, 405 U.S. 150 (1972), "requires the government to disclose an agreement between a witness and the government that might motivate the witness to testify." *Tarver v. Hopper*, 169 F.3d 710, 716 (11th Cir. 1999). "*Giglio* error is a species of *Brady* error that occurs when the undisclosed evidence demonstrates that the prosecution's case included perjured testimony and that the prosecution knew, or should have known, of the perjury." *Ventura v. Attorney General, Fla.*, 419 F.3d 1269, 1276-77 (11th Cir. 2005). For convenience, the Court hereafter will reference petitioner's *Brady/Giglio* claim as his "*Brady*" claim.

Such claims are "context-specific." *Guzman v. Sec'y, Dept. of Corr.*, 663 F.3d 1336, 1351 n. 17 (11th Cir. 2011). Indeed,

> all of our cases reversing convictions on the basis of *Giglio* error -- even those involving false testimony that a witness did not cut a deal in exchange for his testimony -- have conducted careful analyses of the trial record to render a case-specific conclusion as to whether the violation might have made a difference.

*Ventura*, 419 F.3d at 1281. Hence, this "highly fact-dependent inquiry" (*id.*) necessitates extensive factual recitation of Williams' and comparison cases.

# I. BACKGROUND

Petitioner's *Brady* claim pivots on the testimony of Isaac Kemp Fitzgerald, the prosecution's star witness who vacillated when asked to positively identify Williams as one of the men who assaulted the group that he was in. As noted above in footnote 2, this claim is fact and context-sensitive, necessitating detailed factual recitation and case-comparisons. Williams has no quarrel with the Georgia Supreme Court's recitation of the facts:

> At about 5:00 p.m. on October 25, 2007, [Wymberly] Baker, [Donald] Robinson, Isaac Fitzgerald, and Tereen Graham were talking in front of Baker's house in Savannah, Georgia, when a stolen black Toyota Highlander with three or four people in it pulled up. Two men got out and said they were there to rob the victims, who began running. The two men then began shooting. Baker was fatally shot in the chest, and Robinson was shot in the arm. After [Williams' co-defendant, James] Mitchell went through Baker's pockets, the two shooters jumped back in the SUV and fled the scene.
>
> Shortly after the shootings, the police found the Highlander abandoned, with the doors open and the engine running. The two guns used in the shooting, a Tech-9 and a 9mm pistol, were later found near where the SUV was parked. An officer driving near the location of the SUV saw [Williams], who fit the description of one of the suspects and appeared out of breath, walking down the street. [Williams] was detained, and a detective told the officer to interview him and then release him, which the officer did.
>
> Venus McKinney, who has a child with [Williams], voluntarily went to the police station on the day of the crimes. She told a detective

that the night before, [Williams] and Chevis Borrum had come to her house in a black SUV; they drove around for a while; [Williams] parked the vehicle on the street; he spent the night with her; and he had a 9mm gun.  McKinney told the detective that [Williams] left the house in the morning but came back and knocked on her window and asked her to hand him his gun, which she did. McKinney also said that the police had allowed [Williams] to call her when he was detained and she had falsely told the officer that [Williams] was with her at the time of the crimes. The detective testified that between the time of her statement and the trial, McKinney never told him that her story was untrue.  At trial, however, McKinney recanted her statement, claiming that she gave the police false information because she became upset with [Williams] after seeing him earlier on the day of the crimes with one of his old girlfriends.

Jamel Williams testified that he knows both Mitchell and [Williams] because he sold them marijuana.  On the day of the crimes, Mitchell, [Williams], and another man came to his house in a black SUV, and Jamel got in to make the transaction.  Although Jamel testified at trial that he did not know if there were any weapons in the car and did not know the other man's name, the detective testified that, in a pre-trial statement, Jamel said that Mitchell had a Tech-9 and [Williams] had a 9mm handgun at the time of the drug sale and that Chevis Borrum and Eric Brown were also in the SUV.

Borrum testified that [Williams] was his "partner" and they had known each other about eight years.  On the day of the crimes, Borrum said, he was walking with [Williams] when they were stopped and questioned by a police officer.  However, he claimed not to recognize the black Highlander and denied being in it that day, saying that he was out walking when he ran into [Williams] on the street in the neighborhood where the SUV was found and they both live.

At trial, Fitzgerald identified Mitchell as one of the two shooters, but said that he *could not* identify the other assailant because the

man was wearing a bucket hat and "kinda covering his face" with his shirt. On October 26 and December 20, 2007, the detective had shown Fitzgerald six-person photo lineups that included [Williams'] photograph. In the October 26 lineup, Fitzgerald circled [Williams'] photo but said he was *not* positive about the identification and wrote "a little bit" under the photo. The detective testified that Fitzgerald appeared scared and hesitant at that time. In the December 20 lineup, which used a clean copy of the same lineup card, Fitzgerald identified [Williams] as one of the shooters without qualification. Fitzgerald also testified that he had been reluctant to tell the police who the shooters were because he was "real scared about what happened." He added that two or three months after the crimes, he saw [Williams] at a bar, and [Williams] had come over and stood behind him until he and his friends moved.

Although Green and Robinson identified Mitchell as one of the shooters, neither could identify the second shooter. Robinson did testify, however, that Mitchell had a Tech-9 and the other shooter used a 9mm gun.

*Williams,* 290 Ga. at 533-35 (emphasis added).

That court ruled that sufficient evidence supported petitioner's conviction. *Williams,* 290 Ga. at 535. Williams does not challenge that. Instead, "raising the same claims raised in his state habeas corpus petition," doc. 21 at 2, he recapitulates the *Brady* and ineffective assistance of counsel (IAC) claims resolved against him on his direct and collateral appeals. Docs. 1 & 21. Those claims must be reviewed under The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA).

## II. GOVERNING STANDARDS

The AEDPA bars federal courts from granting habeas relief to a state petitioner on a claim that was adjudicated on the merits in state court unless the state court's adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

The case law has fleshed out these statutory terms. On the "facts" prong, § 2254(d)(2), the Court "must presume the state court's factual determinations are correct, unless the petitioner rebuts that presumption with 'clear and convincing evidence.' 28 U.S.C. § 2254(e)(1)." *Jones v. Sec'y Fla. Dept. of Corr.*, 834 F.3d 1299, 1311 (11th Cir. 2016). That's a tough showing to make: "The state court's decision must have been more than incorrect or erroneous. It must have been objectively unreasonable. If the AEDPA standard is difficult to meet, that is because it was meant to be." *Id.* (quotes, cites, and alterations omitted).

As for the "law" prong, § 2254(d)(1),

> a state court decision is based on an "unreasonable application" of clearly established federal law when it (1) "identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case," or (2) "either unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." [*Williams v. Taylor*, 529 U.S. 362, 407 (2000)]. The "'unreasonable application' inquiry . . . ask[s] whether the state court's application of clearly established federal law was objectively unreasonable." *Id.* at 409. This "requires the state court decision to be more than incorrect or erroneous." *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003); *see Harrington v. Richter*, 562 U.S. 86, 101 (2011) ("A state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision." (internal quotation marks omitted)).

*McCartney v. Sec'y, Fla. Dept. of Corr.*, 2016 WL 5349213 at * 4 (11th Cir. Sept. 26, 2016) (footnote omitted). "[A] state court's decision must be not merely wrong but so wrong that no reasonable judge could have reached that decision." *Dassey v. Dittmann*, ___ F. Supp. 3d ___, 2016 WL 4257386 at * 18 (E.D. Wis. Aug. 12, 2016) (citing *Woods v. Donald*, 135 S. Ct. 1372, 1376 (2015)).

On IAC[3] claims courts grant one layer of deference to counsel's decisions and a second to state court IAC rulings (hence, "double deference"). "The tandem effect of the deference given generally to state court decisions under AEDPA, combined with the deferential standard applied to review of an attorney's performance when challenged as being ineffective, means that it will be a rare case in which an ineffective

---

[3] Williams contends that both his trial and appellate counsel were ineffective for missing various claims, including his *Brady* claim. As noted *infra*, n. 4, § 2254 petitioners routinely layer IAC claims alongside their substantive claims to try to show "cause" for any procedural default defense the State may raise. In any event, the IAC evaluation standard is the same for both trial and appellate counsel:

> To prevail on a claim of ineffective assistance of appellate counsel, a habeas petitioner must establish that his counsel's performance was deficient and that the deficient performance prejudiced his defense. *See Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984); *Brooks v. Comm'r, Ala. Dep't of Corr.*, 719 F.3d 1292, 1300 (11th Cir. 2013) ("Claims of ineffective assistance of appellate counsel are governed by the same standards applied to trial counsel under *Strickland*.") (quotation marks omitted). Under the deficient performance prong, the petitioner "must show that counsel's representation fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688, 104 S.Ct. at 2064.

*Rambaran v. Sec'y, Dep't of Corr.*, 821 F.3d 1325, 1331 (11th Cir. 2016). Prejudice is shown if "'but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Rivers v. United States*, 2016 WL 2646647 at * 1 (S.D. Ga. May 9, 2016) (quoting *Strickland*, 466 U.S. at 687).

A typical IAC claim succeeds only where counsel has, metaphorically speaking, shot at the side of a barn yet missed. *See Sullivan v. Secretary, Fla. Dep't. of Corr.*, 837 F.3d 1195, 1205 (11th Cir. 2016) (an attorney's ignorance of a point of law that is fundamental to his case combined with his failure to perform basic research on that point is a quintessential example of unreasonable performance, as element of ineffective assistance of counsel); *see also id.* at 1206 (in prosecution for fleeing and attempting to elude a law enforcement officer, trial counsel was ineffective in presenting a voluntary intoxication defense long after it had been statutorily abolished, instead of advising defendant to accept state's pretrial plea offer).

assistance of counsel claim that was denied on the merits in state court is found to merit relief in a federal habeas proceeding." *Dorvil v. Sec'y, Dep't. of Corrs.*, 2016 WL 6090852 at * 4 (11th Cir. Oct. 19, 2016) (quotes and cite omitted). Courts determine "whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard.' *Richter*, 562 U.S. at 105." *McCartney*, 2016 WL 5349213 at * 4.

Finally, sandbagging is prohibited. Petitioners must submit their claims to the state courts first. New claims advanced to a federal habeas court but not to the proper state court face dismissal on exhaustion, if not procedural default, grounds.[4]

---

[4] "Under the doctrine of procedural default, federal courts do not review the merits of a state prisoner's federal claim if a state-law default prevented the state court from reaching the merits." *Wilson v. Warden, Georgia Diagnostic Prison*, 834 F.3d 1227, 1236 (11th Cir. 2016) (quotes, cites and alterations omitted). There is an exception -- where "the petitioner 'can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice.' *Coleman v. Thompson*, 501 U.S. 722, 750 (1991)." *Sullivan*, 837 F.3d at 1201; *see also Allen v. Secretary*, 2016 WL 762648 at * 5 (M.D. Fla. Feb. 24, 2016) ("To establish cause for a procedural default, a petitioner must demonstrate that some objective factor external to the defense impeded the effort to raise the claim properly in state court. To show prejudice, a petitioner[ ] must demonstrate not only that the errors at his trial created the possibility of prejudice but that they worked to his actual and substantial disadvantage and infected the entire trial with error of constitutional dimensions. In other words, he must show at least a reasonable probability of a different outcome.") (quotes and cites omitted). An IAC showing can supply cause. *Sullivan*, 837 F.3d at 1201.

Here, the State seeks enforcement of its procedural default statute on independent state law grounds, doc. 13-1 at 10, 14 (contending that Grounds 3-5 are procedurally

## III. ANALYSIS

### A. *Brady* Violation

Time erodes all memory and truth's too easily sold. Defense lawyers thus challenge witness perception, recall, and credibility. That task was especially important here because, as the above factual recitation shows, the State had no forensics (like fiber or fingerprints) to link Williams to the crimes. And, as the prosecutor would later concede, the State's case more or less hinged on just one, demonstrably "iffy" eyewitness: Fitzgerald. Williams thus counted on his appointed counsel (Michael Edwards) to zealously challenge Fitzgerald's *pivotal* testimony.

It follows that a leniency deal with Fitzgerald -- one of sufficient impact that if disclosed to the jury it might undermine confidence in their verdict -- would have been critically important for Williams'

---

defaulted). *See* O.C.G.A. § 9-14-51 and *Snowden v. Singletary*, 135 F.3d 732, 736 (11th Cir. 1998) (when it is obvious that unexhausted claims would be procedurally barred in state court, courts can forego needless exhaustion-dismissal "ping-pong" and "just treat those claims now barred by state law as no basis for federal habeas relief.")); *see also* doc. 14-22 at 4-5 (state habeas court Final Order barring what are presented here as claims 3 & 4 as procedurally defaulted). This Court agrees that grounds 3 & 4 -- but not 5 (reached below) -- are procedurally defaulted and thus must be denied.

Note, incidentally, that Williams couched the claims reached on the merits here as IAC claims -- evidently to exploit the "IAC-cause" exception noted *supra*. The state habeas court accepted that presentation tactic -- basically ruling on the merits (*i.e.*, that there had been no due process violation) before denying the overarching IAC claim. That format will be followed here, within § 2254(d)'s deference confines.

prosecutor to disclose. *See Wearry v. Cain*, ___ U.S. ___, 136 S.Ct. 1002,

1006 (2016) (death-row, habeas litigant's conviction vacated upon a

*Brady* violation over police promise to prosecution witness that they

would "talk to the D.A. if he told the truth.") (quotes omitted).[5]  Indeed,

long before petitioner's trial, black-letter law mandated that *any* formal

or informal, written or unwritten, deals or "understandings" had to be

*Brady*-disclosed:

> *Giglio* did not speak in terms of the state's duty to disclose only
> *bona fide* enforceable grants of immunity.  Its reach extends to
> "*any* understanding[s] or agreement[s]." *Giglio*, 405 U.S. at 155,
> 92 S.Ct. at 766 (emphasis added); [*Williams v. Brown*, 609 F.2d
> 216, 221 (5th Cir. 1980)] (duty to disclose extends to "*any* promises,
> agreements, and understandings").  *Cf. McCleskey v. Kemp*, 753
> F.2d 877 (11th Cir. 1985).

*Haber v. Wainwright*, 756 F.2d 1520, 1524 (11th Cir. 1985) (emphasis

added).

---

[5]    Applying precedent established long before the April 10, 2015 state habeas
court ruling in this case, that Court re-illuminated the *Brady* materiality
standard:

> To prevail on his *Brady* claim, [a petitioner] need not show that he "more
> likely than not" would have been acquitted had the new evidence been
> admitted. *Smith v. Cain*, 565 U.S. 73, ___ – ___, 132 S.Ct. 627, 629-31
> (2012) (internal quotation marks and brackets omitted).  He must show
> *only* that the new evidence is sufficient to "undermine confidence" in the
> verdict. *Ibid.*

*Wearry*, 136 S.Ct. at 1006 (emphasis added).  A defendant thus can prevail on his
*Brady* claim "even if . . . the undisclosed information may not have affected the jury's
verdict." *Id.* at 1006 n. 6.

"And, even mere 'advice' by a prosecutor concerning the future prosecution of a key government witness may fall into the category of discoverable evidence." *Tarver*, 169 F.3d at 717 (quotes, cite and alteration omitted). Indeed, a witness' mere *attempt* to obtain a deal before testifying is material, and thus must be disclosed, because a jury may well conclude "that [the witness] had fabricated testimony in order to curry the [prosecution's] favor.'" *Wearry*, 136 S.Ct. at 1007 (quoting *Napue v. Illinois*, 360 U.S. 264, 270 (1959)) (emphasis added). After all, "[t]he amount of prison time a government witness is hoping (or expecting) to avoid by cooperating can be very relevant to his motivation to do (and say) what pleases the government." *United States v. Hall*, ___ F.3d ___, 2016 WL 7383970 at *8 (11th Cir. Dec. 21, 2016) (concurrence).

Thus, in *LaCaze v. Warden*, 645 F.3d 728 (5th Cir. 2011), the Fifth Circuit reversed a district court's failure to grant a § 2254 petition where the prosecution failed its *Brady* duty to disclose the material fact that a witness (who had admitted to shooting the victim and implicating the defendant) had received a verbal assurance from the district attorney's investigator that his son would not be prosecuted. It did not matter that the prosecution told the jury that the witness had received a reduced-

plea deal on his *own* sentence, because he had testified that he "probably would not have given" his implicating statement without the side-deal taking care of his son. *Id.* at 735-36. The state supreme court's determination -- minimizing that violation as not sufficiently material because of the other, disclosed plea deal, the witness' disclosed criminal record, and the fact that his testimony was corroborated -- was objectively unreasonable. *Id.* at 736-39. *LaCaze* reminded that even partly formed understandings, agreements, and side-deals must be disclosed:

> [T]he Supreme Court has never limited a *Brady* violation to cases where the facts demonstrate that the state and the witness have reached a *bona fide*, enforceable deal. In *Napue v. Illinois*, 360 U.S. 264, 270, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959), the Supreme Court explained that the key question is not whether the prosecutor and the witness entered into an effective agreement, but whether the witness "might have believed that [the state] was in a position to implement . . . *any* promise of consideration." *Id.*; *see Giglio v. United States*, 405 U.S. 150, 154-55, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972); *Tassin v. Cain*, 517 F.3d 770, 778 (5th Cir. 2008) ("A promise is unnecessary."). In fact, "evidence of *any* understanding or agreement as to a future prosecution would be relevant to [the witness's] credibility." *Giglio*, 405 U.S. at 155, 92 S.Ct. 763. The question is "the extent to which the testimony misled the jury, not whether the promise was indeed a promise . . . ." *Tassin*, 517 F.3d at 778 (citing *Napue*, 360 U.S. at 270, 79 S.Ct. 1173).

*Id.* at 735 (emphasis added).

Even the *possibility* of a reward must be disclosed.  *United States v.*

*Sigillito*, 759 F.3d 913, 930 (8th Cir. 2014) ("the prosecutor must disclose

the possibility of a reward that gives the witness a personal stake in the

defendant's conviction. *United States v. Bagley*, 473 U.S. 667, 683

(1985).").  Hence -- as reaffirmed just months ago by *Wearry* -- that stake

can arise from a mere generalized assurance:

> In the present case, when [the prosecutor] asked the witness,
> "Have I or any other Assistant District Attorney or anyone offered
> you any kind of deal or any kind of promise or anything in regard
> to your testimony today?" the truthful answer (as the prosecutor
> knew) was "Yes."  The witness falsely testified "No."  The
> prosecution cannot, by keeping its promises of consideration to a
> witness *general in language or tone*, escape the fact that it gives the
> witness reason to believe that his or her testimony will lead to
> favorable treatment by the State.  Unquestionably agreements in
> general terms to reward testimony by consideration create an
> incentive on the witness' part to testify favorably to the State and
> the existence of such an understanding is important for purposes of
> impeachment.

*Dubose v. Lefevre*, 619 F.2d 973, 979 (2nd Cir. 1980) (emphasis added).

Reminding this Court that his conviction pivots on this single

eyewitness' (Fitzgerald's) testimony, Williams contends that the state

habeas court unreasonably erred by denying his *Brady* claim.  Doc. 1 at

18; doc. 21 at 3-4, 10-18.  That court ruled:

> In Ground 2 Williams claims that he was denied federal due process
> of law and [a] fair trial when the prosecution concealed material

impeachment evidence. Isaac Fitzgerald, an eyewitness to the shootings, identified Williams as one of the shooters. Fitzgerald also identified Williams in a photographic lineup. Williams claims that the State made a deal with Fitzgerald, who had a pending drug and firearm case, that he would be given favorable treatment if he testified favorably for the State against Williams. Melanie Higgins, the assistant district attorney who represented the State at trial and on appeal, testified at the second [state habeas] hearing that she did not make any plea offer or deal with Fitzgerald, but that she did tell him that she would notify the assistant district attorney in charge of his case about his cooperation with the State and that the other ADA could consider that in making a plea offer to him.

Doc. 14-22 at 2 (record cites omitted).

After Higgins promised Fitzgerald to inform his prosecutor about his testimonial cooperation, Fitzgerald in fact testified and it was material -- indeed, critical:

After Williams' trial, Ms. Higgins sent an email to the ADA in charge of Fitzgerald's case, Ann Elmore, that Fitzgerald did testify for the State and that *"I don't think there would have been a conviction against Williams had he not testified."* The email also asked Ms. Elmore to consider Fitzgerald's cooperation in determining what his sentence recommendation will be. The warden submitted Ms. Elmore's affidavit which stated that she had made no plea offer to Fitzgerald before Williams' trial. Williams' counsel apparently did not know that Ms. Higgins had told Fitzgerald that she would ask Ms. Elmore to consider Fitzgerald's cooperation, [but] trial counsel did know that Fitzgerald had a pending felony case and cross examined him about it.

Doc. 14-22 at 2-3 (emphasis added; record cites omitted).

Too, there was no dispute that Fitzgerald later received the benefit of his bargain with Higgins. Doc. 14-2 at 23 (Higgins, cross-examined by Williams at the second state habeas hearing in this case, admitted that she kept her end of the bargain after Fitzgerald testified against Williams: "I told [Elmore] that [Fitzgerald] had testified at trial, that it was certainly under adverse circumstances since he had been threatened, and that she should consider that in making a plea offer to him."); doc. 14-20 at 65 (her June 11, 2009 email); doc. 14-20 at 70 (Elmore's June 29, 2009 email plea offer to Fitzgerald's counsel: no jail time but, *inter alia*, 60 hours of Community Service Work "[a]fter having reviewed the facts of this case, as well as Melanie Higgins' description of his cooperation in connection with her murder case"); *id.* at 71 (Elmore's July 27, 2009 email altering the deal in light of new charges but still citing "Higgins' description of his cooperation in connection with her murder case" and offering her "hopes that we can work out a global resolution of the defendant's cases.").

At the second state habeas hearing in this case the State asked Higgins about her transaction with Fitzgerald:

> Q. Now, Ms. Higgins, just to be clear, did you promise Mr. Fitzgerald any particular disposition of his case?

A. No. The only thing I told him was that, assuming that he showed up and testified and -- not necessarily testify. In other words, I didn't tell him what to testify to. In other words, if he showed up and testified, that I would tell Ms. Ellmore that he was *helpful to the State* and that *she could consider that* in making a plea offer to him, but I didn't get into any sort of plea negotiations or tell him that I was going to make any *particular* suggestions on a plea offer to Ms. Elmore.

Q. And just to be clear, you did not offer him -- did you offer him a plea offer in exchange for his testimony in your case?

A. Absolutely not.

Doc. 14-3 at 11-12 (emphasis added).

Accepting this testimony, the state habeas court then crossed over the § 2254(d)(1)-(2) (fact if not also law prong) unreasonableness line. Seeking relief, Williams argued that: (a) a hidden deal had been cut; (b) it made a material difference. The habeas court nonsensically mismashed those two concepts to find that Higgins had cut no leniency deal with Fitzgerald *because* it was not material:

This court concludes that there was no *Brady* violation because the State did *not* make a deal, formal or informal, for Fitzgerald's testimony. The mere fact that Fitzgerald knew that Ms. Higgins would recommend to Ms. Elmore that she consider Fitzgerald's favorable testimony in making a plea recommendation is *not* material in that there is no reasonable probability that the jury would have found Williams not guilty if the jury had known about

Ms. Higgins' promised recommendation.[6]  *United States v. Bagley*, 473 U.S. 667, 105 S.Ct. 3375, 87 LE2d 481 (1985).  Consequently, there was no deficient performance by trial counsel or appellate counsel for failing to raise and litigate Williams' *Brady* violation claim.

Doc. 14-22 at 3 (emphasis and footnote added); *see also id.* at 5 ("this court has found that the State did not have an agreement with Isaac Fitzgerald for his testimony.").  Again, the issue was whether: (a) a deal had been cut; and (b) it made a material difference to the case -- *not* that no deal had been cut because it would not have made any difference to the jury's verdict (an otherwise nonsensical, speculative construct).

The resolution of the presented (as opposed to mishmashed) issue is obvious: *Of course* Higgins cut a deal, *of course* "the State . . . had] an

---

[6]  That's not the standard.  *See supra* n. 5.  In fairness, the standard has been articulated in various, sometimes confusing forms, and it is easily misstated.  Other courts have ventured harmonizations.  *See Kyles v. Whitley*, 514 U.S. 419, 434-35 (1995) ("*Bagley*'s touchstone of materiality is a "reasonable probability" of a different result, and the adjective is important.  The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence.  A 'reasonable probability' of a different result is accordingly shown when the government's evidentiary suppression "undermines confidence in the outcome of the trial." *Bagley*, 473 U.S., at 678, 105 S.Ct. at 3381.").  The "focus [thus] is whether the withheld evidence contains information that could have been used, on cross-examination, to significantly undermine the witness's credibility." *LaCaze v. Leger*, 2008 WL 1836374 at * 4 (W.D. La. Apr. 3, 2008), *rev'd on other grounds*, *LaCaze*, 645 F.3d at 738-39.  But a *Brady* claimant need not show that he would not have been convicted had the *Brady* information been disclosed.  He need only "show that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles*, 514 U.S. at 435.

agreement with Isaac Fitzgerald for his testimony," and *of course* it was material. As just reiterated by the U.S. Supreme Court: Even a generalized assurance -- from the *police*, let alone the prosecutor -- is enough to trigger the prosecutor's *Brady* obligation. *Wearry*, 136 S.Ct. at 1006 (granting *Brady* relief on, *inter alia*, an undisclosed verbal police promise "that they would 'talk to the D.A. if he told the truth'" in exchange for testimony against the accused; death-penalty conviction vacated). And the materiality standard is not very demanding: Whether the nondisclosure put the whole case in a different light and thus undermined confidence in the verdict. *Id.* Again, that means that Williams "can prevail even if . . . the undisclosed information may not have affected the jury's verdict." *Wearry*, 136 S.Ct. at 1012 n. 6.

Higgins was required to disclose to the defense her verbal promise to Fitzgerald that she would tell Elmore of his cooperation.[7] To insist

---

[7] In *Bagley*, on which the state habeas judge here relied, doc. 14-22 at 3, the Supreme Court reasoned that the mere "possibility of a reward gave [two witnesses there] a direct, personal stake in respondent's conviction. The fact that the stake was not guaranteed through a promise or binding contract, but was expressly contingent on the Government's satisfaction with the end result, served only to *strengthen* any incentive to testify falsely in order to secure a conviction." *Bagley*, 473 U.S. at 683 (emphasis added). Citing *Bagley*, the Fourth Circuit perhaps said it best:

> [W]e note that rather than weakening the significance for credibility purposes of an agreement of favorable treatment, tentativeness may *increase* its

otherwise, merely because she omitted the "leniency" adjective when recounting her obvious promise to Fitzgerald (in effect, to "talk to the D.A.," as in *Wearry*),[8] is to enable cynically manipulative semantics to

---

relevancy.   This is because a promise to recommend leniency (without assurance of it) may be interpreted by the promisee as contingent upon the quality of the evidence produced [ -- ] the more uncertain the agreement, the greater the incentive to make the testimony pleasing to the promisor.

*Boone v. Paderick*, 541 F.2d 447, 451 (4th Cir. 1976) (emphasis added), quoted in *United States v. Curtis*, 380 F.3d 1311, 1316 (11th Cir. 2004); *see also Boone*, 541 F.2d at 448 (habeas relief warranted where "the prosecutor concealed an offer of favorable treatment to [petitioner's] principal accuser" and "[h]ad the jury known of the prosecution witness' compelling motivation to establish [petitioner's] guilt, there is a reasonable likelihood its verdict might have been different").

[8]   As noted *supra*, that "talk" paid off for Fitzgerald.   After Williams' conviction, Fitzgerald pled guilty in two criminal cases against him.   The following is a transcript of his lawyer's sidebar discussion with the judge in that case, recounting the Higgins/Fitzgerald deal:

Judge, about three months ago Melanie Higgins came to me and said she needed me to talk to my client about being a witness in a murder case that she was trying in her court.   And Mr. Fitzgerald is a (inaudible) to a murder, and Melanie didn't have any other witness except for him.   So she came to me.   And I brought in a camera and my client and we all sat down and went over the facts (inaudible).   Then he testified truthfully at trial.   And I think without him Melanie would have had a hard time getting that conviction.

She wrote a letter to, I think, (inaudible) discussing the fact that he cooperated fully.   He was even threatened in the hallway by one of the families of the Defendant up there (inaudible).   So he, I think he did his duty as a citizen.   He really went above and beyond (inaudible) and that's part of the reason why (inaudible) both of these cases, I think (inaudible) the Court to consider in lieu of his cooperation was to let him do his time at the Chatham County jail.

Doc. 14-21 at 8-9; *see also* doc. 14-2 at 18 (Williams' trial counsel, at the state habeas hearing in this case, referencing that transcript as evidence of an undisclosed prior deal "which [Fitzgerald] denied on the stand and which the district attorney denied on the record.   And both of those things, as it turns out, were factually false. [¶] But

trump reality. And it cannot reasonably be questioned that Fitzgerald's testimony was material. Higgins herself said: "I don't think there would have been a conviction against Williams had he not testified." Doc. 14-22 at 2-3. The state habeas court itself noted that very testimony before inexplicably dismissing Fitzgerald's testimony and deal as *not* material (*i.e.,* "that there is no reasonable probability that the jury would have found Williams not guilty if the jury had known about Ms. Higgins' promised recommendation."). It is difficult to fathom how a jury could *not* view the case in a different light had it known that Fitzgerald -- shaky on his identification of Williams in the first place -- now had a powerful leniency incentive to please the State with his testimony.

That the state habeas court unreasonably erred is amply underscored by even a passing comparison to the slew of prior, "mere promise" and "understanding" cases, as recently applied in *Wearry*. *Brady*, *Giglio,* and *Napue*, long ago coalesced into black letter federal law that Higgins unmistakably violated here. *Wearry*, for that matter, bears

---

none of that was known until long after the fact, long after the direct appeal." *Id.* And counsel had "filed a standard [pretrial] discovery package that included requests for any exculpatory evidence or any evidence that would possibly be beneficial for [Williams] in [his] case." *Id.* at 19. In response to that testimony, the State successfully requested a follow-up evidentiary hearing to rebut the "factually false" charge. Doc. 14-2 at 39, 40, 61.

compelling comparison to this case because there a generalized *police* (not even a prosecutor's) promise found deep in its factual weeds would ultimately overturn a state supreme court and vacate a capital conviction.

A state-court jury convicted and death-sentenced Michael Wearry for the brutal murder of Eric Walber. *Wearry,* 136 S.Ct. at 1002. Nearly two years after that murder, inmate Sam Scott contacted authorities and implicated Wearry. *Id.* at 1003. Scott claimed, *inter alia*, that Wearry and others had confessed to shooting and driving over Walber's body, then leaving his body on a particular road. *Id.* But Scott got it wrong. Walber had not been shot, and his body had been found on another road. *Wearry,* 136 S.Ct. at 1003. "Scott changed his account of the crime over the course of four later statements, each of which differed from the others in material ways. By the time Scott testified as the State's star witness at Wearry's trial, his story bore little resemblance to his original account." *Id.* The prosecution presented no physical evidence, but offered additional circumstantial evidence to link Wearry to the victim. *Id.*

That included testimony from another inmate, Eric Brown, who claimed to the jury that he was testifying "solely because his sister knew the victim's sister." *Wearry,* 136 S.Ct. at 1003. Brown acknowledged that he'd made a prior inconsistent statement to the police. And the prosecution insisted, at trial, that even though Brown was "doing 15 years on a drug charge," he sought no benefit in exchange for his testimony. *Id.* In addition to advancing testimony from Scott and Brown, the state also tried to link Wearry to the crime through other witnesses' testimony. Ultimately the jury rejected Wearry's alibi defense when it found him guilty. *Id.* at 1003-04.

"After Wearry's conviction became final, it emerged that the prosecution had withheld relevant information that could have advanced Wearry's plea." *Wearry,* 136 S.Ct. at 1004. It had failed to disclose police records that would have undermined Scott's credibility. *Id.* It also "had failed to disclose that, contrary to the prosecution's assertions at trial, Brown had twice sought a deal to reduce his existing sentence in exchange for testifying against Wearry. The police had told Brown that

they would 'talk to the D.A. if he told the truth.'"  *Id.*[9]  Finally, it had

failed to turn over helpful medical and other evidence that would have

impeached Scott.  *Id.* at 1005.

---

[9]  On direct appeal the state supreme court made no mention of that police assurance.  *State v. Wearry*, 931 So. 2d 297, 307 (La. 2006).  Wearry, like Williams here, presented his *Brady* evidence after he was convicted.  Yet, in contrast to Williams' case, the state habeas court's analysis in Wearry's case provides no factual detail behind Brown's deal before reaching the same "not material" result reached by the habeas court in Williams' case :

> [Wearry] asserts that the State failed to disclose its witness Eric Charles Brown's attempt to seek leniency in exchange for testimony.  Disclosure of this information and its effective utilization by defense counsel could arguably have had a measurable effect on the weight afforded by the jury to Brown's testimony.  However, there is no evidence to suggest that Brown was actually able to obtain any benefit *or any assurance of a possibility thereof prior to testifying at trial*.  Further, taken in the context of all of the evidence produced at trial to incriminate the defendant, the evidence regarding Brown's attempt to acquire some advantage by testifying would not have produced a reasonable probability of the defendant's acquittal.

http://www.scotusblog.com/wp-content/uploads/2015/11/Wearry-v.-Cain-petition.pdf (App. at B7) (emphasis added).  Alas, that court's factfinding was flat-out wrong.  There in fact *was* a deal, or at least, an "understanding,"with the police.  Wearry presented details of it in his *certiorari* petition, where he highlighted the "police notes" referred to in the state habeas opinion:

> [Brown] asked if he told what he knew would we not charge him and would we help with the sentence he already had.  We told him we couldn't promise him anything but we would talk to D.A. if he told the truth.  August 2012 Hearing Ex. 13, at p. DAMW000191.

*Id.* at 19.  Brown's counsel wrote the prosecution in quest of a benefit, and that, too, was never disclosed.  *Id.* at 19-20.  These facts underscore a basic pillar of the *Brady* doctrine: It is the *witness's understanding and belief* that he likely will reap a benefit that is relevant -- *not* the prosecutor's characterization (or, as here, minimization) of any deal or "understanding."

They also demonstrate how easy it is to obscure *Brady*-level deals:

Reversing the state supreme court's refusal to overturn Wearry's conviction, the *Wearry* Court first reminded how even the bare nub of a "deal" or "promise" will be considered material, and thus disclosable:

> "[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady, supra,* at 87, 83 S.Ct. 1194. *See also Giglio v. United States,* 405 U.S. 150, 153-154, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972) (clarifying that the rule stated in *Brady* applies to evidence undermining witness credibility). Evidence qualifies as material when there is "'any reasonable likelihood'" it could have "'affected the judgment of the jury.'" *Giglio, supra,* at 154, 92 S.Ct. 763 (quoting *Napue v. Illinois,* 360 U.S. 264, 271, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959)). To prevail on his *Brady* claim, [a petitioner] need not show that he "more likely than not" would have been acquitted had the new evidence been admitted. *Smith v. Cain,* 565 U.S. 73, ___ – ___, 132 S.Ct. 627, 629-631, 181 L.Ed.2d 571 (2012) (internal quotation marks and

---

Although *Brady* and *Giglio* require prosecutors to disclose exculpatory evidence to the defense, it is often extremely difficult for criminal defendants to know whether the prosecution is complying with this obligation. Furthermore, prosecutors exert tremendous control over witnesses.

They can offer incentives -- often highly compelling incentives -- for suspects to testify. This includes providing sweetheart plea deals to alleged co-conspirators and engineering jail-house encounters between the defendant and known informants. Sometimes they feed snitches non-public information about the crime so that the statements they attribute to the defendant will sound authentic. And, of course, prosecutors can pile on charges so as to make it exceedingly risky for a defendant to go to trial. There are countless ways in which prosecutors can prejudice the fact-finding process and undermine a defendant's right to a fair trial.

*United States v. Hykes,* 2016 WL 1730125 at * 14 (D.N.M. Apr. 11, 2016) (alterations omitted) (quoting Alex Kozinski, *Criminal Law 2.0,* 44 Geo. L.J. Ann. Rev. of Crim. Proc. xxii (2015)).

brackets omitted). He must show *only* that the new evidence is sufficient to "undermine confidence" in the verdict. *Ibid.*

*Wearry*, 136 S.Ct. at 1006 (emphasis added).

The *Wearry* Court agreed with the two-justice dissent on what "undermine confidence" means: "Given this legal standard, Wearry can prevail even if, as the dissent suggests, the undisclosed information may not have affected the jury's verdict." *Wearry*, 136 S.Ct. at 1006 n. 6. The bottom line, then, is whether the undisclosed *Brady* evidence was sufficient to "undermine confidence" in the verdict. *Id.* Judges make that call, so *judicial* confidence informs that standard, and judges are duty-bound to prevent due-process offending misuse of their courts.[10]

---

[10]  As another court recently remarked:

> The disclosure problem is not confined to the context of overzealous police officers closing murder cases. It reaches to all corners of the criminal justice system. Judges and scholars are increasingly recognizing the problem with blatant *Brady* violations. *See Daniel S. Medwed, Brady's Bunch of Flaws*, 67 Wash. & Lee L.Rev. 1533 (2010); David Keenan et al., *The Myth of Prosecutorial Accountability After Connick v. Thompson: Why Existing Professional Responsibility Measures Cannot Protect Against Prosecutorial Misconduct*, 121 Yale L.J. Online 203 (2011). For example, in 2012, an investigation revealed that two Department of Justice prosecutors intentionally hid evidence in the 2008 political corruption case against Senator Ted Stevens, the longest serving Republican Senator in history. *See United States v. Stevens*, No. 08-cr-231 (EGS), 2009 WL 6525926 (D.D.C. April 7, 2009)(Sullivan, J.). *See* Henry F. Schuelke III, Special Counsel, Report to Hon. Emmet G. Sullivan of Investigation Conducted Pursuant to the Court's Order (dated April 7, 2009), filed March 15, 2012 in *In re Special Proceedings*, No. 1:09–mc–00198–EGS (D.D.C. March 15, 2012)("Stevens Report"). Special prosecutor Henry F. Schuelke III's

In Wearry's case, "[t]he State's trial evidence resemble[d] a house of cards, built on the jury crediting" a main witness's testimony that Wearry committed the murder over Wearry's alibi evidence. *Wearry*, 136 S.Ct. at 1006. Postconviction investigation unearthed substantial impeaching evidence against Scott that never made it to the jury, and "any juror who found Scott more credible in light of Brown's testimony might have thought differently had she learned that Brown may have been motivated to come forward not by his sister's relationship with the victim's sister -- as the prosecution had insisted in its closing argument --

---

blistering report found that the United States team concealed documents that would have damaged the credibility of key United States witnesses and helped the late Stevens to defend himself against false-statements charges. *See* Stevens Report at 12. Stevens lost his Senate seat as the scandal unfolded, dying at age eighty-six in a plane crash two years later. *See* Carrie Johnson, Report: Prosecutors Hid Evidence in Ted Stevens Case, NPR News (May 15, 2012), http://www.npr.org/2012/03/15/148687717/report-prosecutors-hid-evidence-in-ted-stevens-case. Schuelke based his 500-page report on a review of 128,000 documents and interviews with prosecutors and FBI agents. *See* Stevens Report at 12. United States Attorney General Eric Holder moved to vacate Stevens' conviction. *See* Jerry Seper, *Inquiry Slams Prosecution of Stevens Corruption Case By Justice Department*, The Washington Times (March 15, 2012). The Department of Justice ("DOJ") subsequently "instituted a sweeping training curriculum for all federal prosecutors, and made annual discovery training mandatory." Mark Memmott, *Report Slams Sen. Stevens' Prosecutors,* NPR News (March 15, 2012), http://www.npr.org/sections/thetwo-way/2012/03/15/148668283/report-slams-sen-stevens-prosecutors.

*Hykes*, 2016 WL 1730125 at * 14.

but by the possibility of a reduced sentence on an existing conviction." *Id.* at 1007.

Hence, a mere police promise to say something beneficial if Brown truthfully testified triggered the *Brady* disclosure requirement and thus supported reversal. More to the point, Brown's mere *understanding* of what the police promised was enough to flip that switch. *Id.*; *see also LaCaze*, 645 F.3d at 738 (a key witness' mere "understanding" of leniency is enough).

In *Wearry,* the prosecution adduced other evidence -- beyond Brown's testimony -- supporting Wearry's conviction, yet the *Brady* violation involving the police promise in response to Brown's leniency quest was enough to unravel the conviction and death sentence. Likewise here, the State adduced other, circumstantial evidence (through only one eyewitness, Fitzgerald), but the same result is warranted, and for a *Brady* violation involving not the police, but the prosecutor herself.

Because Fitzgerald's testimony was material -- even crucial -- it cannot reasonably be denied that Higgins' *Brady* violation (her failure to disclose that Fitzgerald had an extra, "leniency incentive" to identify Williams) easily undermined confidence in the verdict here, and thus

more than meets the *Brady* materiality standard. And because the "Higgins/Fitzgerald deal" triggered *Brady*, the state habeas court's ruling directly collides with (as reinforced by *Wearry*) binding precedent established long prior to Williams' 2009 conviction and the state habeas court's April 10, 2015 ruling. Williams therefore is entitled to have his conviction vacated for a new trial.

## B. Government Misconduct

Williams raises Government Misconduct to additionally support relief. Doc. 1 at 20 (Ground Five) ("cumulative effect of prosecutorial misconduct" and ineffective assistance); doc. 21 at 20 (raising the "pattern of prosecutorial deceit and prejudicial conduct"); *id.* at 21 (demanding an evidentiary hearing to "present the testimony of Stan Fitzgerald").[11] It goes unquestioned here that the State cannot advance

---

[11] The State says this claim is unexhausted and procedurally defaulted, doc. 13-1 at 14-18. It is not because it easily is part of, and animates, the core of Williams' non-defaulted *Brady* claim. For that matter, Williams squarely raised his *Brady* claim, and thus the prosecutorial misconduct that advanced it, *before* the state habeas hearings. Doc. 14-1 at 5 (Grounds One & Two alleging, *inter alia*, that "the prosecution concealed material impeachment evidence"); *id.* at 31 (decrying the "surreptitious cooperation agreement" exploited by his prosecutor). He then -- as will be demonstrated here -- faced a *continuation of it* at those hearings.

To that end, he seeks an evidentiary hearing to present Fitzgerald's "deal" testimony, a request now moot since he prevails on this claim. Doc. 21 at 21. Construing his (*pro se*) pleadings liberally, *Drayton v. Sec'y Dept. of Corr.*, 249 F. App'x 813, 815 (11th Cir. 2007), Williams in substance raises a prosecutorial

perjurious or *Brady*-violating testimony, or fabricated evidence, etc., to obtain a conviction. Courts invalidate convictions tainted by such government misconduct. *See Napue,* 360 U.S. at 264 ("our own evaluation of the record here compels us to hold that the false testimony used by the State in securing the conviction of petitioner may have had an effect on the outcome of the trial. Accordingly, the judgment below must be reversed."); *Hayes v. Brown*, 399 F.3d 972, 978-79 (9th Cir. 2005) (State violated defendant's constitutional right to due process in his murder trial when prosecutor knowingly presented false testimony of prosecution witness denying that state had agreed to dismiss felony charges against him in exchange for his testimony, falsely represented to trial judge that there was no such agreement, and failed to correct the record following presentation of the false testimony, even though the witness had been deliberately kept uninformed of the agreement between the prosecution and his counsel); *Hash v. Johnson,* 845 F. Supp. 2d 711, 751-52 (W.D. Va. 2012) (collecting cases where government misconduct, including the failure to disclose exculpatory evidence, justified § 2254 relief).

---

misconduct claim here (*i.e.*, that his prosecutor knowingly allowed misleading if not false testimony to infect the process accorded to him).

Williams has shown that, after Fitzgerald testified against him at trial, trial counsel Edwards -- then unaware of the Higgins/Fitzgerald deal -- cross-examined him. Fitzgerald dodged, evaded, dissembled and ultimately just plain denied that he had spoken to the State about the pending case against him. *Id.* at 961. Edwards verbally chased him:

Q. Why do you have an attorney?

A. Why? For the case, sir.

Q. What case?

A. For this case. Right?

Q. Are you charged in this case?

A. No, sir.

Q. Should you be?

A. No, sir.

Q. Okay. Well, then, why would you have a lawyer in this case? I'm asking you why -- why you have a lawyer right now?

A. Why do I have a lawyer?

Q. Yes.

A. For my case?

Q. Because you have an active case. Isn't that right?

A. Yes, sir.

Q.  And you're cooperating with the State in this case in hopes of getting benefit in your pending felony case, aren't you?

A. *No, sir.*

Q. You're not.

A. *No, sir.*

Doc. 14-15 at 15-16 (emphasis added).

Higgins said nothing.  Edwards pressed on:

Q. Did you talk to the State before trial?

A. Who the State is?

Q. Ms. Higgins or --

A. Yes, I talked to them.

Doc. 14-15 at 16.  Fitzgerald insisted that "[w]e only talked about this [Williams'] case." *Id.* at 17.  Undettered, Edwards persisted:

Q.  And so you -- you believe that you've got this drug case right now, that you're cooperating with the State in this case will help you out in your drug case, don't you?

A. *No, sir.*

*Id.* (emphasis added).

As the record shows, Fitzgerald obviously was not telling the truth and Higgins had ample reason to perceive that. She also had a duty to correct it:

> It is of no consequence that the falsehood bore upon the witness' credibility rather than directly upon defendant's guilt. A lie is a lie, no matter what its subject, and, if it is in any way relevant to the case, the district attorney has the responsibility and duty to correct what he knows to be false and elicit the truth. * * * That the district attorney's silence was not the result of guile or a desire to prejudice matters little, for its impact was the same, preventing, as it did, a trial that could in any real sense be termed fair.

*Napue*, 360 U.S. at 269-70 (quotes and cite omitted); *Hayes*, 399 F.3d at 978 ("the state violates a criminal defendant's right to due process of law when, although not soliciting false evidence, it allows false evidence to go uncorrected when it appears. *See Alcorta v. Texas*, 355 U.S. 28, 78 S.Ct. 103, 2 L.Ed.2d 9 (1957); *Pyle v. Kansas*, 317 U.S. 213, 63 S.Ct. 177, 87 L.Ed. 214 (1942).").[12]

---

[12] Likewise,

> a prosecutor has a constitutional duty to correct *the false impression of facts*. *United States v. LaPage*, 231 F.3d 488, 492 (9th Cir. 2000). "It is of no consequence that the falsehood bears upon the witness' credibility rather than directly upon the defendant's guilt" because "[t]he jury's estimate of truthfulness and reliability of a given witness may well be determinative of guilt or innocence, and it is upon such subtle factors as the possible interest of the witness that a defendant's life or liberty may depend." *Hayes*, 399 F.3d at 986 (citing *Napue*, 360 U.S. at 269).

That duty is not abated or mitigated by the fact that Edwards scored some impeachment points by asking Fitzgerald about his then-pending drug charges. *Napue*, 360 U.S. at 269 ("The principle that a State may not knowingly use false evidence, including false testimony, to obtain a tainted conviction, implicit in any concept of ordered liberty, does not cease to apply merely because the false testimony goes only to the credibility of the witness."); *Jenkins v. Artuz*, 294 F.3d 284, 296 (2d Cir. 2002) (when a prosecutor throws his or her weight behind a falsely testifying witness, challenging the witness's statement runs the risk of implicating the credibility of the prosecutor before the jury.") (quotes, alteration, and cite omitted); *see also State v. Wearry*, 931 So.2d 297, 307 (La. 2006) (showing that Brown was impeached -- a fact that did not stop the *Wearry* Court from later granting relief on *Brady* grounds).

---

*Holland v. Adams*, 2007 WL 7770910 at *16 (C.D. Cal. Apr. 3, 2007) (emphasis added). This aligns with Eleventh Circuit precedent:

> "If false testimony surfaces during a trial and the government has knowledge of it, . . . the government has a duty to step forward and disclose." *Brown v. Wainwright*, 785 F.2d 1457, 1464 (11th Cir. 1986). "In order to prevail on a *Giglio* claim, a petitioner must establish that the prosecutor knowingly used perjured testimony, *or failed to correct* what he subsequently learned was false testimony, and that the falsehood was material." *Tompkins v. Moore*, 193 F.3d 1327, 1339 (11th Cir. 1999).

*Ventura*, 419 F.3d at 1277 (emphasis added).

Instead of upholding her *Brady* disclosure duty and independent duty not to allow perjurious or misleading testimony to advance before the court and jury, Higgins misleadingly rehabilitated Fitzgerald:

Q. Am I handling the case that you have pending?

A. Is you handling it?

Q. Am I -- am I handling the case that you've got pending?

A. No, ma'am.

Q. Okay. Have you had any discussions with me about that case?

A. With the D.A.? No.

Q. With the other -- the other person in my office [*i.e.*, Elmore] who's handling your case?

A. Yes.

Q. Have you had any discussions with that person [*i.e.*, Elmore]?

A. Yes.

Q. Okay. And have you talked to her or did you talk to -- did your lawyer talk to her?

A. No. I just talked to the lawyer.

Q. You talked with a lawyer?

A. Uh-huh (affirmative indication).

Q. Okay. Have you been made any plea offers in that case?

A. *No, ma'am.*

Doc. 14-15 at 18-19 (emphasis added).

Higgins did not correct that testimony to clarify that yes, she'd offered "to talk to the D.A." in his case if he testified. Years later, at Williams' second habeas evidentiary hearing (the first was continued after Williams presented *Brady*-violation evidence and State's counsel successfully requested a second hearing on that point, doc. 14-2 at 39-40, 61, thus giving State's counsel time to meet with Higgins beforehand), Higgins conceded that, prior to that trial she in fact *had* verbally offered to Fitzgerald (and he accepted) a deal -- that if he would testify against Williams, she would confirm his assistance to the prosecutor (Elmore) in the criminal case then pending against him. No one denies that this had to have fostered a leniency understanding in Fitzgerald, nor that such was the obvious (even if then unarticulated by Higgins) benefit.

Yet, when the State questioned Higgins about this at that second hearing, she stood on her insistence that she had extended to Fitzgerald no *formal* plea offer (*i.e.* a specific disposition of the then-pending prosecution against him). Of course, that's beside the point, since clearly established law required disclosure of *any* understanding, formal or

informal, written or verbal, etc. Higgins then conceded (but quibbled even on this point) that she had offered him an *informal* deal which, as the record now shows, paid off for Fitzgerald. The State asked her about it:

> Q. Now, Ms. Higgins, just to be clear, did you promise Mr. Fitzgerald any particular disposition of his case?
>
> A. No. The only thing I told him was that, assuming that he showed up and testified and -- not necessarily testify. In other words, I didn't tell him what to testify to. In other words, if he showed up and testified, that I would tell Ms. Ellmore that he was *helpful to the State* and that *she could consider that* in making a plea offer to him, but I didn't get into any sort of plea negotiations or tell him that I was going to make any *particular* suggestions on a plea offer to Ms. Elmore.
>
> Q. And just to be clear, you did not offer him -- did you offer him a plea offer in exchange for his testimony in your case?
>
> A. Absolutely not.

Doc. 14-3 at 11-12 (emphasis added).

Incredibly, and in an obvious effort to impress the state habeas judge, State's counsel tried to drive the "no-deal" point home by asking Higgins the same question again:

> Q. Did you offer him *anything* for testimony in your case?
>
> A. No, absolutely not.

Doc. 14-3 at 12 (emphasis added).

The honest and inescapably obvious answer to that last question was "yes." Higgins had just testified that she assured Fitzgerald that she would tell Elmore of his cooperation, with the obvious implication that Elmore should cut him some slack in any plea bargain those two might make. It's simply unfathomable that Fitzgerald would agree to testify if Higgins promised to say something *adverse*, or at best neutral about him, to Elmore.[13] Yet, in the face of that straightforward "anything" question and in contradiction of her earlier testimony, Higgins surreally insisted "No, absolutely not." Doc. 14-3 at 12.

To further the "alt-reality" illusion that Higgins was telling the *whole* truth before the state habeas court, State's counsel followed-up:[14]

Q. Did you ultimately contact Ann Elmore regarding Isaac Fitzgerald's testimony?

A. After the trial, I did.

*Id.* at 11-12.

---

[13] It does not matter what he actually believed since the "undermine confidence in the verdict" standard is objective, thus a judicial determination.

[14] Again, at the State's request the judge granted it a second evidentiary hearing -- *after* Williams presented *Brady* violation evidence during the first hearing. Doc. 14-2 at 39-40, 61. This obviously gave Higgins time to confer with the State's counsel before testifying about the Higgins/Fitzgerald deal. Higgins thus had plenty of time to recollect about this case and candidly testify about the *whole* truth.

Higgins then confirmed that, after Fitzgerald's testimony helped her secure Williams' conviction, she emailed Elmore and communicated what the state habeas ruling accurately summarized: "that Fitzgerald did testify for the State and that 'I don't think there would have been a conviction against Williams had he not testified.' The email also asked Ms. Elmore to consider Fitzgerald's cooperation in determining what his sentence recommendation will be." Doc. 14-22 at 2-3; *see also* doc. 14-20 at 65 (her email). This unquestionably (albeit tacitly) urged leniency, which he in fact later received. *See supra* n. 8. Yet Higgins, the state habeas court, and the State now (in its briefs before this Court) persist in advancing the premise that there was no leniency pay-off with Fitzgerald -- merely because Higgins never actually used the word "leniency."

All of that, of course, rests on the facially absurd pretense that tacit agreements never exist. That war against reality ends here.[15] *Wearry*, a summary disposition case that applied long-settled, black-letter law (as

---

[15] "*Brady* violations have reached epidemic proportions in recent years, and the federal and state reporters bear testament to this unsettling trend." *United States v. Olsen*, 737 F.3d 625, 631 (9th Cir. 2013) (Kozinski, J., *dissenting from denial of reh'g en banc*) (collecting cases); *id.* at 632 ("When a public official behaves with such casual disregard for his constitutional obligations and the rights of the accused, it erodes the public's trust in our justice system, and chips away at the foundational premises of the rule of law. When such transgressions are acknowledged yet forgiven by the courts, we endorse and invite their repetition."); *id.* at 626 ("There is an epidemic of *Brady* violations abroad in the land. Only judges can put a stop to it.").

exemplified in *LaCaze*, *DuBose*, etc.), reinforced the fact that Higgins should have disclosed her deal with Fitzgerald at trial so that Edwards could confront him about it. It was prosecutorial (hence government) misconduct to fail to do so. *See United States v. McElroy*, 697 F.2d 459, 463 (2d Cir. 1982) (condemning "potentially misleading characterization[s]" by the prosecution that deceived defense counsel).

Higgins' dissembling minimizations at the state habeas hearing only *continued* that wrong.[16] *DuBose*, 619 F.2d at 978-79 (where state encouraged witness in her belief that testimony favorable to state would be rewarded by more favorable treatment in criminal actions pending against her, fact that promise by state may not have taken specific form did not allow prosecution to avoid disclosing to jury fair import of its

---

[16]  It bears repeating: Once Williams presented supporting evidence of this at the first evidentiary hearing, the State responded: "These are serious allegations with Mr. Edwards saying it [*i.e.*, the Fitzgerald testimony] was blatantly false, and we think that in -- it's in everyone's best interest to run this down, and let's get to it at the next hearing." Doc. 14-2 at 39-40. The state habeas judge granted the State a second chance. *Id.* at 61.

Thus, both the judge and the State grasped the seriousness and consequence of Williams' claim. The State thus had plenty of time to uncover and present the truth of the Higgins/Fitzgerald deal. Having uncovered the truth, it nevertheless failed to truthfully and candidly present it here. Instead, it chose to foray into an Alice-in-Wonderland world where words have no meaning, insisting that in exchange for Fitzgerald's testimony he was offered *nothing* whatsoever, when in truth he was offered a very real *something* indeed -- that his prosecutor would be informed of any cooperation he provided to the State in Williams' case.

That's *not* the way to practice before this Court.

understanding with the witness; question arose during cross-examination and redirect whether the witness and state had made any "kind of deal," and failure to disclose to jury deprived defendant of due process), cited in *Jenkins*, 294 F.3d at 292-93 (witness's false testimony at murder trial, stating that witness had not entered a plea agreement with the state, and state attorney's summation, which placed state's credibility behind witness's false testimony, violated defendant's right to due process, because prosecution's knowing use of false testimony could reasonably have affected trial's outcome, as there were only two substantive witnesses, witness at issue provided the only evidence of motive, and remaining testimony was weak or problematic).

By showing that Fitzgerald misled the jury under oath, that Higgins violated her *Brady* duty, and that she concocted a blatantly bogus semantic distinction to cover it up, Williams has demonstrated *continuing* (through the state's own collateral appeal channel) government misconduct sufficient to support § 2254 relief per the § 2254(d)(1) (law prong) error in the state habeas court's ruling. *See Hash,* 845 F. Supp. 2d at 751-52; *Lockett v. Blackburn*, 571 F.2d 309, 313 (5th Cir. 1979) (deliberate hiding by the government of evidence

favorable to an accused requires habeas corpus relief, and that includes, as in *Boone*, cases where "a prosecutor knowingly elicited false testimony in the petitioner's trial.").[17]

## C. Ineffective Assistance

Evidently for good measure,[18] Williams re-raises his ineffective assistance claims against his trial and appellate lawyers. The record shows that Edwards remained unaware of the Higgins/Fitzgerald deal at trial. Indeed, the state habeas judge found that as a fact, thus documenting Williams' actual prejudice, though the judge's ruling itself includes some minimization: "Williams' counsel apparently did not know that Ms. Higgins had told Fitzgerald that she would ask Ms. Elmore to consider Fitzgerald's cooperation, [but] trial counsel did

---

[17] While it cannot be said that Higgins elicited Fitzgerald's false testimony here, it can be said that she failed to uphold her duty to correct it. Worse, she obscured it through re-direct. Then, all through Williams' state habeas proceedings she persisted with her "no deal" claim, thus contributing to an unreasonable state habeas ruling -- all to Williams' prejudice (he has remained incarcerated under a "life plus 20" sentence throughout these proceedings). *See Wearry*, 136 S.Ct. at 1007 (majority rejected two-justice dissent urging later review under § 2254, and not 28 U.S.C. § 1257(a); among other things, the "lower courts [had] egregiously misapplied settled law" while Wearry endured a death-row existence).

[18] As noted *supra*, n. 4, Williams is sensitive to procedural default, so like many other habeas litigants he has raised IAC claims to exploit the "cause" exception. Doc. 1 at 20 (Ground Five) ("counsel's deficient performance"). Again, the state habeas court's rulings dovetail with this strategy. Doc. 14-22 at 3 ("Consequently, there was no deficient performance by trial counsel or appellate counsel for failing to raise and litigate Williams' *Brady* violation claim.").

know that Fitzgerald had a pending felony case and cross examined him about it." Doc. 14-22 at 2-3.

Sparger (Williams' appellate counsel), for that matter, corroborated Edwards, testifying that he, too, was unaware of the Fitzgerald plea deal. He related key dates: "[T]he trial in Mr. Williams' case was April 15th through 17th, 2009. Mr. Fitzgerald's plea was on August 7, 2009. The transcript of [Fitzgerald's guilty] plea was filed on September 23, 2009." Doc. 14-2 at 41. When Sparger filed an amended motion for new trial on September 24, 2010, he still did not know of that deal. *Id*. He was embarrassed "that I missed a *Brady* violation," and did not know about it until Edwards conveyed his suspicions to him. *Id*. at 41-42.

These lawyers were entitled to rely on the prosecutor to uphold her *Brady* duty. Higgins did not. She quibbled by pretending that her oral, generalized *quid pro quo* (which she later fulfilled, in *writing*) "somehow" did not constitute a deal with the State in exchange for favorable (here, pivotal) testimony. By rehabilitating a secret-deal witness who was critical to her case, Higgins *doubly* violated her independent duty to correct his misleading testimony by crossing a long-established line. *Shipley v. United States*, 2016 WL 6884930 at * 9 (W.D.

Tex. Nov. 21, 2016) ("[T]he prosecution's use of false or misleading evidence is unconstitutional pursuant to *Napue v. Illinois*, 360 U.S. 264 (1959), and its progeny."); *Ventura*, 419 F.3d at 1278. These lawyers had a right to rely on her. She failed them. They thus were not deficient, so petitioner's IAC claims against them fail, and the state habeas ruling cannot be assailed on that score.

### D. Venus McKinney

Recall that Williams unsuccessfully raised four IAC claims on direct appeal, *Williams*, 290 Ga. at 535-40, and re-raises them here. Doc. 1 at 2; doc. 13-1 at 1-2; doc. 21 at 2. Even though he prevails on his *Brady* claim, this Court must reach his remaining claims. *Clisby v. Jones*, 960 F.2d 925, 936, 938 (11th Cir. 1992) (*en banc*); *see also Sampson v. FCC Coleman USP I Warden*, 2016 WL 5845685 at * 3 (11th Cir. Oct. 6, 2016) ("In *Clisby*, we instructed district courts to resolve all claims for relief raised in petitions for writs of habeas corpus, pursuant to 28 U.S.C. § 2254."); *Blackburn v. United States*, 2016 WL 5376196 at * 1 (11th Cir. Sept. 27, 2016) ("regardless of whether relief is granted or denied.").

In Ground 1, reached on the merits by the state habeas court, Williams contends that the State denied him his federal due process right

to a fair trial when Higgins presented misleading testimony from Detective Keith Dennis about what the mother of Williams' child, Venus McKinney, told the police prior to trial. As the *Williams* court recounted, she inculpated him but at trial insisted that she lied to the police out of anger at Williams because she'd seen him with an old flame.

After reminding Dennis about McKinney's recantation at trial, doc. 14-17 at 48, Higgins asked him:

Q. Okay. Did -- did she ever get in touch with you between then and now and indicate that [that her prior assertions were false] to you?

A. No. She did not say that all that was false, no.

*Id.* Keith testified that McKinney later faded away and then refused to communicate further. *Id.*

Q. Okay. But at that point -- she didn't say at that point, you know, I've lied to you guys or I haven't told what's accurate?

A. No. She didn't.

Q. She never said that?

A. No.

*Id.*

In her closing argument Higgins reminded the jury that McKinney never told the police, prior to trial, that she'd lied to them:

No. She waited until she got here so she could look good in front of the boyfriend. You know, she's doing the obligatory nice girl friend dance, you know, so he won't be mad at her. But, she didn't back off her statement one bit. She quit cooperating. She wouldn't talk to the police anymore, but she -- she didn't call them back and say big mistake.

Doc. 14-18 at 53.

Williams says both Dennis and Higgins knew (and thus misled the jury) about McKinney's recantation. At the two state habeas hearings he presented a CD-ROM that he says proves that fact. He now says that the

CD-ROM recording petitioner proffered during the state habeas proceeding shows that Venus McKinney told state investigators during an interview on December 30, 2008, four months before petitioner's criminal trial, that she had falsely implicated petitioner in the aggravated assault of Donald Robinson and the felony murder of Wymberly Baker. The state prosecutor, Melanie Higgins, testified during an evidentiary hearing before the state habeas court on July 23, 2014 that she had listened to the CD-ROM recording of the December 30, 2008 interview between state investigators and Venus McKinney before petitioner's criminal trial. Still, the state prosecutor did not correct the misleading trial testimony of Detective Dennis that Venus McKinney never recanted her pretrial incriminating statement before petitioner's criminal trial. Rather, the state prosecutor exploited Detective Dennis' misleading testimony in an effort to discredit the exculpatory trial testimony of Venus McKinney.

Doc. 1 at 17. Thus, Williams concludes, the State violated his due process, fair trial rights by failing to disclose to the jury that McKinney

in fact *did* recant her pretrial incriminating statement before his criminal trial.[19]  Doc. 1 at 16-17; doc. 21 at 1-6.

The problem for Williams, however, is that he never could get the CD-ROM to play at the state habeas hearings.  Nor does he cite to (nor can this Court find) any place in those hearing transcripts showing that Higgins conceded his claim about the CD-ROM's contents.  *See* doc. 19-3 at 19-21 (he questioned her about this at the state habeas hearing; she said she listened to a December 30, 2008 CD-ROM recording of a McKinney/police encounter but did not concede recantation).  The state habeas court ruled that Williams failed to support this claim because "he was unable to play the recording."  Doc. 14-22 at 2.  Hence, petitioner "failed to carry his burden of proving that the State presented misleading testimony and argument at trial," which means neither of his lawyers performed deficiently by failing to litigate this claim.  *Id.*

This Court has permitted Williams to make unlimited filings here. *See* docs. 23 & 24.  Even so, Williams fails to proffer even his own transcription (or offer of proof) of what the CD-ROM reveals.  And he obviously must know, since he claims its contents support this claim.

---

[19]    Again, he (evidently sensitive to procedural default arguments) nominally presented this as an IAC claim, which -- as will be shown below -- is how the state habeas court treated it.

His evidentiary hearing request[20] (to play the CD-ROM to this Court), doc. 21 at 20-21, is therefore **DENIED**.

Williams could not meet the objectively unreasonable, § 2254(d) threshold in any event. Assume that the CD-ROM proves McKinney did, prior to his trial, claim to the police that her inculpatory statements were false *and* that Higgins knew about it by the time of trial. Nevertheless, McKinney's laughable-level answers to basic questions from Higgins irreparably shredded her own credibility at trial, thus reducing this to a non-material matter. Take the undisputed facts here first. They show that McKinney was summoned to the scene of Williams' arrest, spotted his old girlfriend, then got so upset that she voluntarily contacted the police and gave them information *against* Williams. There is no suggestion that *that* much of the story would have been negated by the CD-ROM's contents.

---

[20] For that he must either: (1) satisfy 28 U.S.C. § 2254(e)'s requirements for an evidentiary hearing, or (2) show that he exercised diligence in his efforts to develop the factual basis of his claims in state court proceedings. *Libberton v. Ryan*, 583 F.3d 1147, 1165 (9th Cir. 2009). He has done neither here. *See also Carmichael v. United States*, 2016 WL 4524461 at * 6 (11th Cir. Aug. 30 2016) ("a district court need not hold an evidentiary hearing if the petitioner's allegations are patently frivolous, based upon unsupported generalizations, or affirmatively contradicted by the record.") (quotes and cite omitted). At most Williams has advanced generalized assertions about the CD-ROM's contents, not any specifics (*e.g.*, a proffered transcription showing, for example, that McKinney told the police "that what I told you was false, I made it up out of jealous rage," etc.).

It also is undisputed that McKinney changed her story (now favorable to Williams) at trial. But Higgins then asked her simple questions about her initial story to the police. Doc. 14-16 at 43-53. That's where McKinney impaled her own credibility. Higgins asked her to assume it was true that she initially lied to the police just to spitefully get Williams in trouble -- but if that was so, then why would she be so specific about, for example, that Williams had stayed with her and kept a gun at her house, she had seen him "in a car and had a gun," *id*. at 44, and that he drove a "black Toyota Highlander?" *Id*. at 47-48.

McKinney's responses ("'Cause I was upset") to those questions (doc. 14-16 at 48) were jaw-droppingly absurd. Being "jealous-upset" at Williams may have driven her to inculpate him to the police, but that simply does *not* explain how she could have known about the correct gun and getaway-vehicle details that she initially related that day. The jury was entitled to reason that a jealousy-enraged woman simply would not have included such accuracy of detail in "mistaken" statements to the police. Hence, even if the jurors had heard the CD-ROM and that showed that McKinney had, before trial, recanted her statements to the police, they likely would have dismissed it as the obvious lie of a

girlfriend having second thoughts/regrets, and that her trial testimony merely repeated that obvious lie in a lame effort to assist her boyfriend.

It follows that, even if such error figured into his conviction, Williams nevertheless "cannot show prejudice [even] under *de novo* review, [which is] the more favorable standard for review" for [him]." *Smithers v. Sec'y, Fla. Dept. of Corr.*, 501 F. App'x 906, 908 n. 1 (11th Cir. 2012) (citing *Berghuis v. Thompkins*, 560 U.S. 370, 390 (2010)). Consequently, the state court habeas ruling on petitioner's "McKinney" claim is not objectively unreasonable under either § 2254(d) prong.

## IV. CONCLUSION

Jarnard M. Williams' 28 U.S.C. § 2254 petition should be **GRANTED** in part and **DENIED** in part. On his *Brady* claim (ground 2) and government misconduct claim (ground 5) this Court should vacate his conviction and order his retrial or release within 120 days of the date that the Court enters a Judgment granting habeas relief. His evidentiary hearing request (doc. 21 at 20-21) is **DENIED**.

Applying the Certificate of Appealability (COA) standards set forth in *Brown v. United States*, 2009 WL 307872 at * 1-2 (S.D. Ga. Feb.9, 2009), the Court discerns no COA-worthy issues to the claims that have

been denied here, so no COA should issue if he appeals. 28 U.S.C. § 2253(c)(1). And, as there are no non-frivolous issues to raise on appeal, an appeal on that basis would not be taken in good faith. Thus, *in forma pauperis* status on appeal should likewise be **DENIED**. 28 U.S.C. § 1915(a)(3).

Finally, this Report and Recommendation (R&R) is submitted to the district judge assigned to this action, pursuant to 28 U.S.C. § 636(b)(1)(B) and this Court's Local Rule 72.3. Within 14 days of service, any party may file written objections to this R&R with the Court and serve a copy on all parties. The document should be captioned "Objections to Magistrate Judge's Report and Recommendations." Any request for additional time to file objections should be filed with the Clerk for consideration by the assigned district judge.

After the objections period has ended, the Clerk shall submit this R&R together with any objections to the assigned district judge. The district judge will review the magistrate judge's findings and recommendation pursuant to 28 U.S.C. § 636(b)(1)(C). The parties are advised that failure to timely file objections will result in the waiver of rights on appeal. 11th Cir. R. 3-1; *see Symonett v. V.A. Leasing Corp.*,

648 F. App'x 787, 790 (11th Cir. 2016); *Mitchell v. U.S.*, 612 F. App'x 542, 545 (11th Cir. 2015).

**SO REPORTED AND RECOMMENDED**, this 3rd day of January, 2017.

UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF GEORGIA